STATE OF IOWA, Appellee, v. MILO HARTMAN, Appellant.

No. 40360.

NOVEMBER 24, 1931.

H. E. Narey, W. B. Bedell, and Coyle & Coyle, for appellant.

K. B. Welty and J. J. Hess, for appellee.

GRIMM, J.—The scene of this trouble was on the shore of Lake Okoboji in Dickinson County. John Hartman, father of the defendant, was the owner of what is known as the ''Eagle Boat Line,'' and Jasper Alexander and Frank Long were the owners of a competing line. Hartman had rented a concession from the owner of the land adjacent to the lake on the south side of the neck of water connecting East and West Okoboji, and had constructed several docks thereon, from which as a base he handled his boat traffic. The landward end of these docks was connected by a sidewalk and handrail running approximately east and west. Between two of his docks, a street belonging to the town of Arnold's Park terminated at the lake shore.

About July 1, 1929, Alexander and Long constructed a dock extending into the lake at the end of the street, and at the land end of their dock, they cut the handrail on the sidewalk constructed by Hartman and extended their dock over Hartman's sidewalk to the street; and immediately the trouble between these boat lines commenced. Each owned several different boats which were engaged in passenger traffic and competition became very bitter. Arnold's Park is a summer resort and there were many concessions, stands, amusements, dance hall, etc., which attracted a large number of people to the lake during the summer season. Threats were made by defendants that they

would tear out the docks of Alexander and Long and would have all of the business to themselves. On the other hand, Alexander and Long and their associates and employees made similar threats against the Hartmans, each side indulging in vulgar and blasphemous language.

Many things were said by the owners or representatives of each of the boat lines derogatory to the boats, the patrons, and the individuals of the other boat lines. Much of this was done through megaphones and some of it in private conversation. Some of it was done in the presence of a few passengers or prospective passengers of some of the boats and many of these remarks were made in the presence of many assembled people.

This warfare, which was general on either side of the controversy, lasted from about the first of July to the 28th thereof. On that date, there was a collision between one of the boats of one line and one of the boats of the other line, resulting in a catastrophe.

The Hartmans had been in business for a considerable period of time before Alexander and Long came into the picture. It appears that about the fifth of August, one morning, Alexander and Long began installing their dock. In doing so, as previously stated, some of the sidewalk, railing and signs of the Hartmans were torn down or destroyed. The mayor and other officials were called into the controversy and the Alexander crowd defied them and, in substance, everyone else. There is an intimation in the record to the effect that the inspector was related to and friendly to some of the Alexander people. This possibly furnished the background for the courage and audacity with which the Alexander people acted in the premises.

I. The crime charged is a conspiracy. It may be established by circumstantial evidence. State v. Sterling, 34 Iowa 443; State v. McIntosh, 109 Iowa 209. In State v. Manning, 149 Iowa 205, this court said:

"* * * neither the nature nor the existence of a conspiracy can be established by the acts or declarations of one conspirator in the absence and without the knowledge and concurrence of the other. Wiggins v. Leonard, 9 Iowa 194; State v. Weaver, 57 Iowa 730 * * *."

In State v. Tedd, 196 Iowa 292, this court said:

"This rule, in substance, is that, when a conspiracy is proved, every conspirator is charged with knowledge and responsibility for the acts and statements of his coconspirators said and done pursuant to the conspiracy, and before its consummation. \* \* \* The objective of the prosecution is not to show crime perpetrated pursuant to a conspiracy. The crime charged is the conspiracy itself, and without any reference to the overt acts perpetrated pursuant thereto. The only burden upon the State is to prove the conspiracy. If the conspiracy is proved by legal evidence, then the defendant is guilty. The acts and declarations of Hahn and Lucas in the absence of the defendant were not, and could not be, admissible as proof of the conspiracy."

In State v. Paden, 199 Iowa 383, this court said:

"A conspiracy involves concert of action, and the gist of the crime is the unlawful agreement with intent to do the thing charged in the indictment. Proof of the overt act charged, is not sufficient *per se* to warrant a conviction. It is probative, but not conclusive. Briefly stated, it is competent to prove overt acts, with other facts and circumstances, for the purpose of showing the common intent entertained by the defendants. State v. Madden, 170 Iowa 230. The trial court recognized this rule, and instructed the jury that: 'The doing of such overt act did not constitute the crime charged in the indictment unless there was an agreement and confederation between the defendant M. W. Paden, A. R. Drake, and John F. Smith, or either of them, to do such act prior to the time such act was done, if it was done.' This was the law of the case. It is the law of the state."

Other cases might be cited, but the foregoing will suffice.

II. There is here no direct evidence of any agreement or understanding between the Hartmans and, to say the least, there is a very distinct controversy as to whether any such agreement or understanding ever existed.

The defendant unequivocally denies there was any understanding or agreement of any kind or character between him and his father in reference to what was said or done by either of them. A careful reading of the entire record impresses one with the thought that there is here a rather skillful effort on

the part of the state to prove the essential prima facie fact of conspiracy by the statements made by Milo Hartman, the defendant, or John Hartman, his father, many of which were made by John Hartman, not in the presence of the defendant.

It clearly appears from the record that neither of the Hartmans had any advance information in reference to the installation of the pier at the end of the street by Alexander. When the defendant, Milo Hartman, discovered what was going on, he naturally protested, and his remarks on that occasion are introduced in evidence, presumably in support of the proposition that he and his father had prior thereto entered into a conspiracy as charged in the indictment. As a matter of fact, there is no evidence whatever in the record to show that the defendant and his father had, previous to that time, any knowledge of the installation or the proposed installation of this pier, and necessarily there was prior thereto no meeting or agreement between the defendant and his father, as charged in the indictment.

There is nowhere in the record any showing by any direct evidence, written or oral, that the Hartmans had any agreement among themselves about what should be said or done. As the battle raged between these two contending forces "fighting for the supremacy of the sea," the owners and their most menial employees frequently used the word "we" in connection with their expressions as to what would or would not be done in reference to transportation on the lake or in reference to the details thereof and concerning the various boats in either fleet.

It quite clearly appears from the entire record that the Alexanders were the aggressors and instigated the warfare by building the dock and tearing down the property of the Hartmans.

The trial lasted more than a week and many witnesses were introduced on either side. Many statements of each of the defendants were admitted in evidence when not shown to have been made in the presence or hearing of the other defendant.

The testimony of several witnesses introduced on behalf of the State was taken relating statements made by John Hartman, many of which were not made in the presence of the defendant Milo Hartman. Some of these statements were made when Milo Hartman was in sight, but it is not shown that Milo Hartman

heard or understood the statements alleged to have been made by John Hartman.

We will not extend this opinion by quotations from said testimony, but only say that in the main these statements were very prejudicial to the defendant Milo Hartman.

After the trial had progressed for approximately a week, during much of which time these statements were before the jury as admitted evidence, the trial court struck all of said statements from the record. The court instructed the jury as follows, after the close of the evidence and after the arguments:

"I have withdrawn from your consideration the evidence of all the witnesses who have testified to the statements, acts, and conduct of John Hartman not made or done in the presence and hearing of defendant Milo Hartman. The defendant Milo Hartman should not be held to have heard any statement made by John Hartman, even if made in his presence, unless you find from the evidence that he did hear and understand them; nor should you find that Milo Hartman knew of the acts or conduct of his father, John Hartman, even though in his presence, unless from the facts or circumstances shown in the evidence you find from the evidence that he knew of such acts and conduct at the time."

In State v. Paden, 199 Iowa 383, in a case where the defendants were charged with a conspiracy, this court said:

"We cannot feel that the striking from the record of the evidence of this act of vandalism cured the prejudice resulting from its improper admission."

This court, in State v. Lyons, 202 Iowa 1195, said:

"There have been cases where we have been constrained to say that evidence improperly admitted and subsequently excluded was of such a character, when considered in connection with the other evidence, that the error was not thereby cured."

See also McKee v. Iowa Railway & Light Co., 204 Iowa 44. In State v. Canalle, 206 Iowa 1169, this court said:

"True, there are cases wherein we have been constrained to say that evidence improperly admitted was of such toxic character that the error was not cured by striking same and

giving proper admonitions to the jury. State v. Poston, 199 Iowa 1073; State v. Paden, 199 Iowa 383; Quillen v. Lessenger, 190 Iowa 939; Hood v. Chicago & N. W. R. Co., 95 Iowa 331.''

Considering the character of the evidence under consideration, the length of time it was before the jury, the general manner in which it was withdrawn, and all the other facts and circumstances in the case, we are constrained to hold that by reason thereof the defendant did not receive a fair trial, and the cause must be, and is,—Reversed.

FAVILLE, C. J., and EVANS, KINDIG, and STEVENS, JJ., concur.